We'll hear the next case, Banyai v. Berryhill. Good morning, Your Honors, and may it please the Court. Spencer Derlin for Appellant, Kenneth Banyai. The Court should vacate the judgment below and remand for further administrative proceedings because the ALJ, who denied Mr. Banyai's claim for disability insurance benefits, overlooked or ignored the only pre-DLI medical evaluation in the record and also failed to develop and interpret that record in accordance with rules that were designed to ensure that inferences about disability onset have a legitimate medical basis. How would you respond to this, that if Mr. Banyai engaged in substantial gainful activity, both before and after his date last insured, that that means that under Step 1 he was not disabled at the time, regardless of what the medical reports show or what the medical consultant would say? That's true in the abstract. In other words, if a person is not disabled at Step 1, then there is no resort to Step 2. That's the end of the analysis. But that's certainly not a determination that this Court could make here, because there The critical piece here is that determination at Step 1 is not limited to simply comparing a claimant's earnings to the earnings thresholds that are set out in the regulations. That's the start of the step, but it's by no means the end of it. And here, for example, the earnings that Mr. Banyai obtained from his work at the ticket delivery service, there is ample evidence in the record that he could rely upon to establish that those wages were earned under special conditions, and they would not then be counted against him at Step 1. On page 28 of the Commissioner's brief, she concedes that this is a Step 2 case. It's not a Step 1 case. And because of the Chenery Doctrine, because this Court's review is narrow in the sense that it's either giving a thumbs up or thumbs down on what the agency did, there's no opportunity here for the Court to resort to other steps. That's the Melville v. Actful case. This Court does not resolve or does not address the steps in the first instance. That's for the ALJ to do. Really the only question here is whether there is any evidence of a medically determinable impairment. It's not severity. That's what the ALJ determined. So at page 25 of the record, the ALJ says, in the beginning of the Step 2 discussion, the ALJ says there are no medical findings, there are no medical signs or laboratory findings to substantiate an impairment. The entirety of her legal discussion is about the prerequisites to establishing an impairment. There's nothing about severity. On page 26, she says there is no evidence of a medically determinable impairment. She cites Dr. Murag for that proposition and concludes that Mr. Bonnier is not disabled under the regulations because there is inadequate evidence of a medically determinable impairment. That's the stated basis for the agency's determination, and that basis is indefensible for precisely the reason that the Court suggested in its order appointing counsel. Those school records, and in particular, the 1989 evaluations conducted by Drs. Safer and Blumenthal are objective medical evidence. They are in the record. They were... Was there a determination that he was not disabled prior to 2000 under the other provision? He applied for earlier for disability and lost, right, in a prior proceeding. He applied under Title 16 and Title 2. That's correct. Right. And he... There was a finding at that point that he was not disabled during that period. I'm not sure what you're... Prior to 2000. That's... Well, his Title 2... The Title 2 claim is the only one that would be retroactive, that looks back... I understand that. Right. But I'm looking now at the earlier determination that he wasn't disabled, I guess it was under Title 16, prior to 2000. Is that accurate? That's not accurate, Your Honor. The Title 16... What was the determination? The determination is that he was, under Title 16, he is disabled from May 2000, as of May 2009, the date of his application. So that application, that request was granted. Okay. Leave that aside. Okay. What was determined with respect to prior to 2000? The Title 2 determination was denied on the ground that there was insufficient evidence of a medically determinable impairment. It's the same ground that the ALJ relied upon. And so what... But you have to show an impairment prior to 2000 in order to recover here, right? Because that's the last date. That's correct. The DLI is... Right. 12-31-99. So basically what you're saying is they didn't do enough of an investigation into that period? Well, what I'm saying is that... There was sufficient evidence. Are you going against what was determined before? There are two possibilities. I guess I'm saying both. At the very least, the ALJ did not, either didn't consider or didn't adequately address the only pre-DLI medical evaluation that's in the record. Those two evaluations are critical, particularly because there was not any other evidence, any other pre-DLI evidence. All of those prison records from November 1993 to May of 1999 were not recovered. So the only medical... Yes? Not obtained any of the records from prison, medical records from prison? None of those records were obtained. That's correct, Your Honor. You're putting it in the passive voice. It's the responsibility of the claimant here to get those records. It's also the responsibility of the ALJ. So in other words, efforts were made to get the records, and they failed. That's correct, Your Honor. In our view, insufficient efforts were made, and you're absolutely right that it is a dual responsibility. Of course, the claimant has a responsibility to present any evidence that he or she has, to sit for consultative examinations, as Mr. Bonnier did, and to attempt to assist in the obtaining of the records. And of course, Mr. Bonnier was represented, but this Court's precedents hold that the ALJ's duty to develop the record does not wax and wane depending on whether or not the claimant is represented by counsel. It is the ALJ's ultimate responsibility to develop the records that she needs in order to make a reasoned decision, one with substantial evidence. In the SSR 8320, my reading is that the counsel did not raise that SSR 83020 issue before the administrative law judge, and only did so before the district court. Is that correct? Yes, I think that's correct, but to the extent that Your Honor is implying that there's a waiver for failure to raise that argument, I would strenuously disagree, for much the same reason that I would disagree that it's Mr. Bonnier's fault that the medical records are not complete. Here, the nature of the administrative proceeding is entirely different from standard federal court litigation. It's an inquisitorial proceeding. The ALJ is not relying upon the parties to raise particular arguments or to flush out particular issues. Does it matter at all if that SSR 8320 has been apparently repealed and replaced with a new ruling that says that it's discretionary for the ALJ to call medical experts? No, it does not matter in two ways. First, it doesn't change the ALJ's obligation to apply 8320 at the time. In fact, the new ruling, 1801P, specifically says we expect federal courts to judge our decisions based on the rulings that were in place at the time. If we were to send it back for the ALJ to follow a rule 8320, it would be the amended rule that they would follow now. I mean, it would be the current rule, right? That's absolutely right, Your Honor, and that would not be a futile gesture because 1801P still requires the ALJ to at least exercise her discretion over whether or not to consult with a medical advisor. And here, the commissioner has not even disputed our argument that the ALJ did not exercise her discretion in that respect. There was no discussion of that rule, no indication that the ALJ applied that rule at all. And in that respect, it's much like the Johnson case, where the court was presented with a decision in which it simply was not clear whether the ALJ had applied the treating physician rule. And so the court said, we're not going to speculate about what the commissioner might or what the ALJ might have done had that rule been applied. Instead, we're going to send it back because this claimant is entitled to have her claim decided by the applicable legal principles. And of course, as you point out, the applicable legal principle will be 1801P and not 8320 now. But the new ruling is really not all that different. Yes, it changes must to discretionary, but the ALJ still has to exercise discretion. It still says that if a person is disabled, the ALJ must select an onset date. And it still says that, recognizes that the onset date may very well predate the earliest medical record. And in order for an ALJ to determine that onset date, the 1801P says you should look at the nature of, among other things, the nature of the claimant's disease or injury. And it reconciled the fact that an onset date is required for you to prevail prior to the DLI, the date, DLI. And at that time, there was a determination of the disability had not been proved. Well, I guess what I would say in response to that, this is essentially the argument that the commissioner has raised. My response would be that I think it would be entirely arbitrary to draw this distinction between in one circumstance, if the state agency examiner says you are disabled now, but you were not before, then there's no resort to 8320 at all. Even though you have an established present disability. One that in this case, the ALJ heartily endorsed. Whereas in another case, if the state... Are you asking to overturn the prior decision? No, it's a separate, it's a separate proceeding, I guess is what you're saying. And therefore, it doesn't, there could be a fresh investigation that might be in conflict with the earlier outcome, might determine that there was an onset date that predated 2000. That's right. So what I'm saying is the onset question arises when you have a claimant who has, who is presently disabled. And then the question then becomes, okay, is that present disability, did that arise when that person was covered by disability insurance? Right. So what I'm saying is it doesn't make any sense to draw a distinction between a case where the ALJ herself finds the claimant presently disabled, or a case like this one, where the state agency examiner finds the ALJ presently disabled, I'm sorry, the claimant presently disabled. And the ALJ says, yeah, I agree with that, but I don't see any medical evidence of any object of medical evidence of an impairment. I just think that if the court in particular looks at the 1989 evaluations in conjunction with the rest of the evidence, I see no way to conclude that Mr. Banya had no impairment at all on or before the DLI. I understand that there are other questions about his claim. I'm not suggesting that this is a case where the court should simply remand for the calculation of benefits, but those are factual matters, medical questions that need to be addressed in the first instance to the ALJ on remand. Thank you. Good morning, Your Honors. My name is Jolie Apicella from the United States Attorney's Office, Eastern District of New York, for the Commissioner. Just to address a few issues in the appellant's argument, I . . . Let me just ask you at the outset. Let's say that, for the sake of argument, that we were to agree with you that the evidence suggested that Mr. Banya was engaged in substantial gainful activity in 1989, and let's say for the sake of argument that we were to agree with you that he is not shown that his impairment was severe. The ALJ, as I understand what the ALJ did, was to base the ruling only on the finding that there was no impairment. If that's so, how can we rule on one of the alternative bases? In terms of how can you rule on the gainful? I think the answer to that is that she reached the decision that there was no disabling severity, not in a bubble, but looking at the only records that we have, so those 25 pages. Even in those 25 pages, we have glimpses of what he was doing at the time. It's not just pure medical records. He's being evaluated by a psychologist for the purpose of being in an IEP program. They're evaluating him in terms of vocation, and what he can do, and what his interests are. The ALJ didn't flatly say what you're just saying, right? No, and she doesn't have to under the law. She referred to the report. She carefully considered it. There's no reason for us to determine that she did not carefully consider it, because it's in her opinion. There just isn't enough there. The records are not conclusive to support a medically determinable severe disability, as it must be. With respect to the ALJ's decision, and the hearing, she said at the hearing, or the ALJ said at the hearing, that she would look into subpoenaing records from the Rikers Island Infirmary. At least that was the drift of what the ALJ was saying that the ALJ was intending to do. Did that happen? I did not find an indication in the record that that did or did not happen. I did not see one way or the other. I know that in that same conversation, and I want to stress that during the hearing, he was represented by a very experienced Social Security Counsel, Christopher Bowes. He said he was in Rikers from 1993 to 1996. That was the first place that he was incarcerated while he awaited his sentencing. Christopher Bowes said the records will follow him from institutions, so I will subpoena the last institution that he was at. She had already subpoenaed the Chateau Gay Institution, and I think he made the promise that he would look into getting the records from the Lincoln Center, which I think was the halfway house. Again, it is a dual responsibility. It is a dual responsibility. It is a complete independent responsibility on the part of each person. It is not sort of you do half and I will do half. I do not think there . . . If she was assured that his counsel, and ultimately it is his burden, so he has every reason to go out and find these records . . . Unless she had an independent duty under the law, not just relying on counsel. I see what you mean, and I do think she has a duty, but I think if he is saying, I will subpoena, I will bring these records to you, she can rely on that. I do not know why she could not or why she would have to double the work, duplicate the efforts. What about Bear Hill and Lion Mountain? She was going to do Chateau Gay. There was Rikers. Then there is Bear Hill and Lion Mountain in the picture. She did send a subpoena to Lion Mountain. Sorry, she did? She did. The ALG did send a subpoena to Lion Mountain. I will need to check about the Bear Hill, but I . . . Are you saying they do not have an argument that there was an insufficient effort to obtain these records? No. I think she did fulfill her duty by sending those subpoenas, discussing it with counsel. This conversation is happening in 2010, and they are talking about records from 1993 to 1999. During that conversation in the transcript, nobody really seems like it is realistic to get these records. They are talking about how your name disappears under the website, and you cannot even find the . . . Is there a retention policy in these institutions? That is, after a period of time, they do not have to be retained anymore just as a matter of ordinary administration? I do not know each institution's retention policy, but I have seen it as 10 years, which would make sense. When you talk about impairment, an impairment, as I understand it, is a psychological abnormality. We know that Banier's IQ was borderline for retardation. You have Dr. Safer who said that he expresses, that is, Banier expresses, profound personality disturbance. You have Dr. Blumenthal who says, and I quote, psychologicals who are highly pathologic. Isn't that abnormal? It does not reflect normal, but that is not sufficient to be a severe medically determinable impairment. I think the IQ evidence is really inconclusive. It does reflect borderline intellectual functioning, but the regulations even recognize that persons with a lower IQ may hold a full-time job and not be disabled if their adaptive functioning is sufficiently intact. But you would agree that de minimis abnormalities would count as an impairment? Yes, in combination, or if he is sufficiently impaired so that he, again, it's really intertwined in the fact of the working. Here we know that at the time of the IQ test, he was working on the weekends. In the year prior, he made, I think it was, in the next year, working as a longshoreman, he made $11,000, or over $11,000. Is there any determination about when the onset date was of the disability that was found? No, she did not have to determine an onset date. Why not? The onset date could have been prior to 2000. For the Title 16 claim? It doesn't matter. The Title 16 is forward-looking, right? Right. No, I'm talking about the Title 2. She did not find an onset date because she did not find a sufficiently severe disability. But when was there no... When was the onset? There's no onset date. We don't even know when the onset date was. Because how can you find an onset date for a disability that doesn't exist? At some point, there was a disability, right? Right, but it was after the date last insured. I'm asking you when the onset date was. I'm sorry, I didn't hear that. I'm asking you what the onset date was of the disability that was found. Well, the alleged onset date was May 17, 1993, when he had a car accident. That's what he claimed. That's what he claimed. But there was no finding, one way or the other, about an onset date after that. Right, and it's the government's position that we did not need to make a finding because we were looking for a disability before the date last insured. And at that period in time, there was no disability. Can I come to this question in a slightly different way? You agree, I gather, that the plaintiff is currently disabled, right? Yes. And that he suffers from severe psychological difficulties, including bipolar disorder, right? I know that there was not a finding based on the bipolar disorder, but that he has mental impairments that qualify as a disability. As a severe psychological difficulty. Correct, I agree. Okay. Now, the school records apparently indicate that he had possibly related mental health problems in high school, right? Possibly. I don't think they're as conclusive as that. Well, what were the records that the ALJ had regarding school period? Well, there are 25 pages of a triennial review that was done by a psychologist and a psychiatrist. During high school. During high school, just like a three-month period during the second half of 1989. It doesn't even follow him the full year, it doesn't do his first year of high school, it's just this 11... How many pages? 25. A lot of pages. Among psychologists, I gather, they tend not to write very much. I hadn't heard that. Lest you subpoena the records. Very famous principle of psychological and psychiatric practice. I understand. So, the school records definitely indicate that he had related mental health problems in high school. There's no doubt about that. I think he had issues in high school, and some of which are not... I'm not talking about issues, I'm talking about mental health problems. I don't think they're so conclusive on any mental health diagnosis. They mention anxiety, depression, I think those are common to 17-year-olds. The testing is not fully explained. We don't know if they use methods of testing that are still employed to this day. So, I guess what we're all getting at, in different ways, is trying to find out why the ALJ did not consult with a medical expert to determine when the disability likely manifested. The disability which we know, from which we know he suffers. He just didn't do it at all, right? The ALJ did not do that. She did not consult with a medical expert, aside from the state medical examiner, who did not have those records in front of her at the time. That is true. But she did not have an obligation to do so. And I think there just is not enough in those school records for her to say, this has been going on for the past 12 months, as it must. And I think especially when you consider that with the fact that he had been working on the weekends and working the year after. Just looking at that time period, there is not a disability that continues for the 12-month period, based on those school records alone. Let's talk a little bit about these various records. Hospital records from 2009 include his psychiatric history, correct? Correct. He reported that psychiatric history. And this was before the ALJ. Right, and she considered it. And that includes his claim that in prison he was placed in a psychiatric unit and treated for bipolar disorder, right? That's his testimony. It's based on what he responded. It's not substantiated or corroborated by any objective evidence. What would you require? Well, the prison records would be helpful. Was there a finding of somehow his statement about his psychological history was not credible? Was there a finding to that effect? There is not a finding to that effect, though there are contradictory statements in the record. And the standard is that the SSA cannot rely on the claimant's statements about their own symptoms. There needs to be objective measures, medical testing, et cetera. But we don't have that. We don't have that. Because maybe not enough of an effort was made. Subpoenas were sent to the institutions. They came back saying that we never had an inmate under this name, the name is not pulling up. So I think an effort was made. I think it was a sufficient effort, and I think these records likely don't exist, and on remand you wouldn't get any farther. Thank you. Thank you, Your Honors. May it please the Court, just a few quick points in rebuttal. Every single argument that is made in contravention to Mr. Bonnier's argument here is an argument that is different from the argument that the ALJ made, from the rationale that the ALJ gave. The Court would have to contravene Johnson, Melville, Burgess, Colville, that entire line of cases in which the Court has maintained a very disciplined separation between this Court's role and the role of the ALJ for important separation of powers reasons, because of different institutional competencies, and so on. So every time that the Commissioner talks about earnings or every time the Commissioner talks about severity or talks about the durational requirement to establish disability, not one of those things is a basis that the ALJ gave for her determination. I understand the temptation to look beyond and try to predict how might this shake out, but it's really not this Court's function to do that. The Court needs to be specifically concerned with the impairment question, and Chief Judge Katzmann, you asked about de minimis impairments. Under this Court's Dixon decision, de minimis is the threshold between severe and non-severe. Severe sounds like it's very serious, but it's really not, as the Court has interpreted that regulation. In order for it to be a valid implementation of the statute, it needs to screen out only de minimis claims or only de minimis impairments. Here, I don't see any reasonable argument that he did not have serious psychological problems, as Judge Cabranes pointed out. Highly pathologic testing, testing indicative of severe pathology, profound personality disturbance, borderline IQ, and on and on and on. So with that respect, I urge the Court to concentrate its focus solely on the ALJ's determination. With respect to the subpoenas, yes, subpoenas were sent out. Yes, Mr. Bowes was enlisted to assist with gathering the records. But if it's not too much to ask the ALJ to send subpoenas, I would think that it's not too much to ask the ALJ to demand an adequate response. I mean, Shadegay said, we don't even know who this guy is. That's not good enough. I mean, the ALJ, her responsibility is to develop a record that she can use. Yes, please. What would she have done in those circumstances, presented by that kind of response from a relevant institution? I would expect her to follow up, and, in fact, the regulations state. Yeah, that's what I'm asking. How would you, quote, follow up, unquote? I would send a letter. I would resend a subpoena. I would get on the phone. And I think the same thing applies with respect to Mr. Bowes. Sure, it's perfectly reasonable, as Ms. Aposella pointed out, for her to delegate some of her responsibility to Mr. Bowes. He says, I'll do this. But I still think that she needs to follow up with him before she writes a decision saying, we don't have enough records. And that's particularly true in this case, given the disproportionate, well, not disproportionate, but the enormous weight that she placed on records during the DLI period. Ms. Aposella pointed out, in part of her argument, the prison records would be helpful. They most certainly would be. And, in fact, during the first hearing, the ALJ said, I can't do anything without those records. Mr. Bonnier, I need those records. And yet she then wrote a decision denying his claim without doing all that much to follow up on her demands for those records. So, with respect to the bipolar disorder, 385 of the record, Dr. Marag, who's the psychological consultant, indicates his medical records substantiate a claim of bipolar disorder. And so to understand, if you are trying to figure out, what is the onset of this man's disability? We know he has one. We know he has bipolar disorder. He reported, he wasn't reporting his symptoms. Finish up your thought. Certainly. So he doesn't merely report his symptoms. He's reporting a diagnosis that he received, and that diagnosis would be in the record had the prison records been secured. Thank you very much. Thank you. Thank you both for your good arguments. The Court will reserve decision.